UNITED STATES SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

William LANDBERG, Kevin Kramer, Steven Gould, Janis Barsuk, West End Financial Advisors LLC, West End Capital Management LLC, and Sentinel Investment Management Corporation, Defendants,

and

Louise Crandall and L/C Family Limited Partnership, Relief Defendants.

No. 11 Civ. 0404 (PKC).

United States District Court, S.D. New York.

Oct. 26, 2011.

George S. Canellos, Howard A. Fischer, Cynthia Anne Matthews, Neal Ralph Jacobson, U.S. Securities and Exchange Commission, Matthew James Watkins, Covington & Burling LLP, New York, NY, for Plaintiff.

Michael Fred Bachner, Bachner & Associates, P.C., Paul Rooney, Agnieszka Dominika Kusmierska, Paul K. Rooney, P.C., Dominic Joseph Picca, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., Arnold Mitchell Greene, John Dominick D'Ercole, Robert Roy Leinwand, Robinson Brog Leinwand Greene Genovese & Gluck P.C., Andrew G. Celli, Adam R. Pulver, Emery Celli Brinckerhoff & Abady, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

The Securities and Exchange Commission ("SEC") brings this action against William Landberg, Kevin Kramer, Steven Gould, Janis Barsuk, West End Financial Advisors LLC, West End Capital Management LLC, and Sentinal Investment Management Corporation, as defendants, and Louise Crandall and L/C Family Limited Partnership, as relief defendants.[1] Steven Gould was, at all times relevant to the Complaint, the Chief Financial Officer ("CFO") of the three corporate defendants (collectively, "West End"). The amended complaint ("Complaint") alleges that the defendants made false representations in violation of section 17(a) of the Securities Act of 1933 (the "'33 Act"), section 10(b) of

---

1. Defendant Barsuk settled the case with the SEC on September 7, 2011.

the Exchange Act of 1934 (the "'34 Act"), Rule 10b–5 promulgated under the '34 Act, sections 206(1) and 206(2) of the Advisers Act of 1940 (the "'40 Act"), and section 206(4) and Rule 206(4)–8 promulgated under the '40 Act. Specifically it alleges with respect to defendant Gould, that he committed primary violations of the '33 and '34 Acts and aided and abetted violations of the '40 Act.

Defendant Gould moves to dismiss the complaint for failure to state a claim upon which relief may be granted and for failure to comply with the pleading requirements of Rule 9(b), Fed.R.Civ.P. 9. This Court concludes that the SEC has adequately and plausibly alleged facts to state a claim for relief under section 17(a) of the '33 Act and section 10(b) and Rule 10b–5 of the '34 Act. Additionally, the SEC has adequately stated a claim for relief under sections 206(1), 206(2), 206(4) and Rule 206(4)–8 of the '40 Act. For the reasons more fully discussed below, Gould's motion to dismiss is denied.

## BACKGROUND

The Complaint alleges that William Landberg led a fraudulent scheme which he carried out with other senior executives at West End. (Compl. ¶ 2.) West End was a New York-based, unregistered investment adviser that created and offered a number of private funds starting in 2003. (Compl. ¶ 2; SEC Mem. at 1.) As of May 2009, ninety-four investors had invested an approximate total of $66.7 million in West End funds. (Compl. ¶ 26.) Gould, who has been a certified public accountant since 1991, became the CFO of West End in September 2006. (Compl. ¶ 15, 62.) From at least January 2008 to May 2009, West End allegedly misled investors into believing that their money was safely invested, and Gould allegedly played an integral role in furthering and concealing that fraud. (Compl. ¶¶ 2–3, 71, 73.)

By early 2008, West End had two primary funds, the Franchise Fund and the Hard Money Fund. (Id. ¶ 42.) These funds invested in restaurant franchise loans and real estate loans, respectively. (SEC Mem. at 2.) Some agreements between the Hard Money Fund and real estate developers required the developers to deposit money into an interest reserve account ("IRA"). (Compl. ¶ 33.) This account was to be held in trust by West End for the bank providing the majority of capital for those loans. (Id. ¶¶ 28, 33.) These agreements prohibited commingling funds in the IRA with funds in any other account. (Id. ¶ 33.) Because the two primary funds did not generate adequate returns to satisfy their obligations, Landberg allegedly used whatever assets were available to satisfy West End's most impending obligations without regard to any representations made to the investors as to the use of those assets. (Id. ¶¶ 43–44.) For example, Landberg used money that had been lent to the Hard Money Fund for the purpose of making real estate loans to make distributions to investors. (Id. ¶¶ 49–51.)

The Complaint asserts that Gould knew and fully participated in this scheme. (Id. ¶¶ 62–65.) Gould allegedly generated fraudulent account statements and other marketing materials that misrepresented the financial performance of the West End funds. (Id. ¶¶ 62–64.) As CFO he allegedly knew, or was reckless in not knowing, that the returns were not adequate to meet the funds' obligations. (Id. ¶ 65.) As early as December 2007, Gould was concerned about cash flow problems arising from the two funds. (Id.) In March 2008, he was "backed into a corner" with respect to finishing the financial statements of one of the funds because it "made money (barely squeaking by) but not a sufficient enough return to the equity in-

vestor." (*Id.*) In 2008, Gould permitted Landberg to overvalue West End's investment in a mortgage company at $1.20 per share even though the subprime mortgage crisis had made the stock largely illiquid, usually trading at ten cents a share. (*Id.* ¶¶ 67–68.) Gould was also aware of extensive commingling of assets as evidenced by a spreadsheet he prepared in early 2009 showing $54 million in interfund money transfers since 2007. (*Id.* ¶ 66.) West End raised over $4.7 million from investors in 2009 allegedly by reporting false positive returns for its funds. (*Id.* ¶¶ 5, 60.)

According to the Complaint, between January 2008 and May 2009, West End and Landberg also misused investor assets, fraudulently obtained over $8.5 million in loans, withdrew millions of dollars from an IRA for unauthorized purposes, and misappropriated at least $1.5 million for personal use. (*Id.* ¶¶ 2–3, 52–53, 69, 71, 76.) Gould, at Landberg's direction, used money from the IRA to make an unauthorized investment in a Florida-based bank. (*Id.* ¶¶ 70–71.) Gould also allegedly created accounting mechanisms, such as "reclassif[ying]" intercompany loans as an investments, to conceal these violations. (*Id.* ¶¶ 71, 73.) Gould described one interfund transfer as a way to "clean" a "related party loan." (*Id.* ¶ 73.) In 2008, and under Landberg's instructions, Gould took money sent to the Income Strategies Fund and put it "back" in the IRA. (*Id.* ¶ 69.) Subsequently, he emailed Landberg to ask how to ensure that the IRA had enough money explaining that it had to be "replenish[ed] ... by weeks [sic] end." (*Id.*) To sustain the illusion that West End's investments were performing well, Landberg made distributions to certain West End investors using proceeds from fraudulently-obtained loans. (*Id.* ¶ 2.)

The Complaint alleges that Gould not only knew, or was reckless in not knowing, about this fraudulent scheme but also acted to further and conceal it. (*Id.* ¶¶ 62–78.) As CFO of West End, Gould received hundreds of thousands of dollars in salary. (*Id.* ¶ 77.) The fraud at West End "began to be revealed" in May 2009 and on May 12th Gould suffered serious injuries after being struck by a train. (*Id.* ¶ 74.)

Plaintiff seeks to permanently enjoin defendant Gould from engaging in the acts, practices, transactions, and courses of business alleged in the Complaint. Plaintiff also seeks civil monetary penalties pursuant to section 20(d) of the '33 Act, section 21(d) of the '34 Act, and section 209(d) of the '40 Act.

## DISCUSSION

### I. *Rule 12(b)(6) and Rule 9(b) Pleading Standards*

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). In considering a Rule 12(b)(6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 1949–50, and all reasonable inferences are drawn in favor of the plaintiffs. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam).

In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P.[2] Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud." Requiring particularity serves to give a defendant notice of the plaintiff's claim and safeguards a defendant's reputation from "improvident" charges. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). To satisfy this pleading threshold, the complaint must " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)).

## II. SEC's Claims Pursuant to Section 10(b), Rule 10b–5 and Section 17(a)

In order to state a claim under section 10(b) of the '34 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, the SEC must plead that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999). The same elements required to establish a section 10(b) violation and a Rule 10b–5 violation suffice to establish a violation under sections 17(a)(1)-(3) of the '33 Act, with the exception that scienter is not required for the SEC to enjoin violations under subsections (a)(2) or (a)(3). *See Id.* The statutory language of section 17(a) is broad and bars "any person in the offer of sale of any securities [from] ... directly or indirectly ... employ[ing] any device, scheme or artifice to defraud ...." 15 U.S.C. § 77q(a)(1).

Gould does not assert that the alleged statements or omissions were insignificant to investors or that they did not coincide with a securities transaction. *See Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000) ("At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.") (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting the standard in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for section 10(b) and Rule 10b–5 actions)); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ("It is enough that the fraud alleged 'coincide' with a securities transaction." (citing *United States v. O'Hagan,* 521 U.S. 642, 656, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997)). Accordingly, the Complaint alleges sufficient facts, including making misleading financial statements and raising $4.7 million of investment, to meet the materiality and nexus requirements. (*Compl.* ¶¶ 60, 62–64.)

---

2. The heightened pleading requirements set forth in the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions filed by the SEC. 15 U.S.C. § 78u–4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter."); *see In re Reserve Fund Sec. & Derivative Litig.,* 732 F.Supp.2d 310, 318 (S.D.N.Y. 2010) (concluding that the terms of the PSLRA do not apply to fraud actions filed by the SEC).

The Supreme Court recently held that liability under Rule 10b–5(b) only attaches to persons or entities who have "ultimate authority over the [untrue] statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders,* —— U.S. ——, 131 S.Ct. 2296, 2302, 180 L.Ed.2d 166 (2011). Ordinarily, "attribution within a statement or implicit from surrounding circumstances is strong evidence" that a statement was made by the party to whom it is attributed. *Id.* But "one who prepares or publishes a statement on behalf of another is not its maker." *Id.*

Assuming *arguendo* that *Janus's* holding applies to SEC enforcement actions, it does not require that the SEC's claim against Gould under Rule 10b–5 be dismissed for two reasons.[3] First, Rule 10b–5 provides additional bases for the SEC's claim beyond the making of fraudulent statements. Specifically, it also prohibits employing "any device, scheme, or artifice to defraud" or engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with a securities sale. 17 C.F.R. § 240.10b–5. The Complaint plausibly alleges that Gould violated Rule 10b–5 beyond the making of a statement. (Compl. ¶¶ 2–3, 62–73.) Second,

the SEC alleges adequate surrounding circumstances for a reasonable fact finder to conclude that the statements alleged to be fraudulent were implicitly attributed to Gould, which is "strong evidence" that Gould was the "maker" of those statements, thereby satisfying *Janus.* (Compl. ¶¶ 15, 62–64.)

■ Gould also asserts that the Complaint does not adequately allege scienter. To adequately plead scienter in the context of securities fraud, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *Novak,* 216 F.3d at 306 (quoting *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 52 (2d Cir.1995)). A "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak,* 216 F.3d at 307 (internal quotation marks omitted).[4] Here, the SEC asserts that they have adequately pled scienter by alleging facts that constitute strong circumstantial evidence of defendant's conscious or reckless misconduct. (SEC Mem. at 16.)

Reckless conduct is " 'at the least, conduct which is highly unreasonable and

---

**3.** *See Janus,* 131 S.Ct. at 2302–03 (stating that *Janus's* rule follows from the Court's decisions in two cases governing private rights of action under Rule 10b–5).

**4.** The Second Circuit's "strong inference" standard predated the adoption of the PSLRA and, indeed, has been incorporated into the PSLRA. 15 U.S.C. § 78u–4(b)(2) (requiring plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); *see Novak,* 216 F.3d at 311 ("[W]e hold that the PSLRA adopted our 'strong inference' standard . . . ."). No controlling authority holds that the "strong inference" standard as used in the PSLRA governs actions brought by the SEC. *See In re Reserve Fund Sec.,* 732

F.Supp.2d 310, 318 (S.D.N.Y.2010) (finding that the terms of the PSLRA do not apply to fraud actions filed by the SEC). Although the Second Circuit has not directly addressed the issue, courts in this Circuit have declined to extend the Supreme Court's interpretation of the PSLRA's "strong inference" standard in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), to SEC enforcement actions. *See e.g., In re Reserve Fund Sec.,* 732 F.Supp.2d 310, 318 (S.D.N.Y.2010); *S.E.C. v. Pentagon Capital Mgmt. PLC,* 612 F.Supp.2d 241, 263–64 (S.D.N.Y.2009); *S.E.C. v. Dunn,* 587 F.Supp.2d 486, 501 (S.D.N.Y.2008). This Court also declines to do so.

which represents an extreme departure from the standards of ordinary care ... to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308 (ellipsis in original) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978) (internal quotation marks omitted)). The Second Circuit in *Novak* provided guidance as to claims based on recklessness: "[t]ypically [complaints] have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." 216 F.3d at 308.

Moreover, allegations of recklessness have been found to be sufficient where "plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* "'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness.'" *Id.* (ellipsis in original) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996)).

*Novak* also identified several important limitations on claims based on recklessness. First, allegations of "fraud by hindsight" are not sufficient. *Id.* at 309. ("[Defendants] need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); *see Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). Second, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309. Moreover, "coupling a factual statement with a conclusory allegation of fraudulent intent" does not satisfy the pleading requirement because "such allegations are 'so broad and conclusory as to be meaningless'." *Shields*, 25 F.3d at 1129 (quoting *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir.1982)).

The Complaint alleges that Gould participated in and concealed the fraud at West End. *Id.* ¶¶ 62–64. Specifically, it alleges that Gould knowingly or recklessly, issued account statements that reported false investment returns and compiled and distributed inaccurate financial results for specified West End funds in 2008 and 2009. *Id.* ¶¶ 63–64. Gould allegedly sent emails to Landberg and Kramer, the President and Chief Operating Officer of West End, that indicate that he was aware that there was a cash flow problem at West End. *Id.* ¶ 65. His email from December 2007 describes the impact of specified funds on cash flow as "tremendous" and requests a meeting with Landberg and Kramer to discuss the matter. *Id.* In March 2008, Gould "told" Landberg and Kramer with respect to the "financials" of a specified fund that he was "backed into a corner" because the fund "made money (barely squeaking by) but not a sufficient enough return to the equity investor." *Id.*

The SEC also alleges that Gould knew, or was reckless in not knowing, about the extensive commingling of assets at West End. *Id.* ¶ 66. Gould prepared a spreadsheet in early 2009 that showed $54 million in interfund transfers and was "copied on numerous emails detailing these transactions." *Id.* An outside accountant also told Gould in April 2009 that he and Gould had to "work together (and perhaps with Bill [Landberg]) to look at "the collectibility [sic] of the intercompany receivables." *Id.* ¶ 75. The Complaint also alleges that Gould knew, or was reckless in not knowing, that these interfund transfers were made because particular funds that had invested in a mortgage company could not

cover their liabilities.[5] *Id.* ¶ 67. Gould allegedly knew that the intervening sub-prime-mortgage crisis had made West End's stock in the mortgage company illiquid but, at Landberg's direction, prepared account statements that materially overstated the value of that investment based on the previous year's valuation. *Id.* ¶ 68.

The Complaint also alleges that Gould improperly used money from the IRA to make an unauthorized investment in a Florida-based bank on behalf of a different West End fund and then disguised the source of the money.[6] *Id.* ¶ 71. It also alleges that Gould knew, or was reckless in not knowing, of improper withdrawals from the IRA by Landberg and that Landberg was commingling West End accounts with his personal accounts. *Id.* ¶¶ 71, 76. Gould allegedly emailed Landberg to ask how to "replenish" the account and was told to use money from a different West End fund and from one of Landberg's personal accounts. *Id.* ¶ 69. The Complaint also alleges that Gould's "otherwise unnecessary accounting maneuver[s] to disguise the transaction[s]," which he describes as "reclassif[ying]" and "clean[ing]" belies his lack of knowledge. *Id.* ¶¶ 71, 73.

■ The SEC identifies facts that would place a reasonable person on notice as to the falsity of the representations being made and that suggest Gould was ignoring obvious signs of fraud. Gould's factual claim that his role as CFO of a public company was merely that of a "scrivener," (Gould Reply Mem. at 6.), can only be resolved at trial or on a full factual record.

Moreover, a party cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand." *S.E.C. v. McNulty*, 137 F.3d 732, 737 (2d Cir. 1998) (finding the requisite scienter where the defendant included false statements in SEC filings even though the corporate officials upon whom he was relying for information behaved evasively towards him and made suspicious statements to him).

■ Under the so-called group pleading doctrine, a plaintiff may "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent" but only as to individuals with "direct involvement in the everyday business of the company." *See In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 641 (S.D.N.Y.2007) (internal quotation marks omitted). The SEC is nonetheless required to allege that "the defendant was sufficiently responsible for the statement—in effect, caused the statement to be made—and knew or had reason to know that the statement would be disseminated to investors." *S.E.C. v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 489–90 (S.D.N.Y.2007). The Complaint alleges facts showing that Gould, the CFO, had direct involvement in the everyday business of West End and prepared financial statements knowing they would be disseminated to investors.

Taken together, the allegations satisfy the SEC's burden of adequately pleading scienter. Gould implies that he was also "fooled" by Landberg's fraudulent scheme and asserts that the SEC has failed to

---

5. Gould asserts that the SEC's failure to name the mortgage company in the Complaint fails the Rule 9(b) pleading standard. (Gould Mem. at 8.) Because Gould identified the company as Geneva Financial, and the SEC has confirmed that he is correct, the omission is immaterial. (SEC Mem. at 4.)

6. Gould asserts that the failure to set forth the name of the Florida-based bank in the Complaint violates Rule 9(b). (Gould Mem. at 10.) The SEC has confirmed that Gould has correctly identified the bank as Century Bank, and this omission is also immaterial. (SEC Mem. at 4.)

establish that Gould knew his actions, such as removing money from the IRA, were securities violations. (Gould Mem. at 7–8, 20.) At trial, this may or may not prove to be the case, but in a motion under Rule 12(b)(6), the court is required to draw all reasonable inferences in favor of the non-movant. Accordingly, Gould's motion to dismiss the claims against him for securities fraud under section 10(b), Rule 10b–5 and section 17(a)(1) is denied.

### III. SEC's Claims Pursuant to Sections 206(1), 206(2), 206(4) and Rule 206(4)–8

█ In order to state a claim for aiding and abetting violations under section 206(1), 206(2), 206(4) of the '40 Act and Rule 206(4)–8 promulgated thereunder, 17 C.F.R. § 206(4)–8, the SEC must plead "(1) the existence of a securities law violation by the primary ... party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."[7] *IIT v. Cornfield*, 619 F.2d 909, 922 (2d Cir.1980).

Gould asserts that the SEC allegations of scienter are insufficient to meet the pleadings standard for aiding and abetting violations. Specifically, he asserts that the SEC is trying to apply retroactively a recklessness standard adopted in the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd–Frank") and that the facts alleged are insufficient to establish a knowing violation. He also asserts that the SEC is impermissibly trying to impose civil penalties for aiding and abetting violations of '40 retroactively based on Dodd–Frank.

Neither of the retroactivity arguments has merit. The scienter standard in this Circuit included recklessness prior to Dodd–Frank. *See S.E.C. v. Gabelli*, 2010 WL 1253603 (S.D.N.Y. Mar. 17, 2010) (denying motion to dismiss aiding and abetting violations of the '40 Act where complaint plead that defendant "knew or was reckless in not knowing" of the underlying violation), *rev'd on other grounds*, 653 F.3d 49, 58 (2d Cir.2011); *see also S.E.C. v. DiBella*, 587 F.3d 553 (2d Cir.2009) (finding that aider and abettor knew or should have known of the underlying violation). Civil penalties were also imposed on aiders and abettors in this Circuit prior to Dodd–Frank. *Gabelli*, 653 F.3d at 58 ("This Court has previously held that civil penalties may be assessed in connection with such a claim."); *See DiBella*, 587 F.3d at 571–72 (imposing civil penalties on aider and abettor violations of the '40 Act prior to Dodd–Frank).

Gould's final argument, that the Complaint does not sufficiently plead actual knowledge of primary '40 Act violations, is unavailing because sufficient facts, as described above, have been plead to meet both a recklessness and an actual knowledge standard. (Compl. ¶¶ 60–76.) Also and as described above, the Complaint alleges sufficient facts to satisfy the other

---

7. Section 206 provides in relevant part:
It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; ...

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative. 15 U.S.C. § 80b–6.

pleadings requirements. As such, Gould's motion to dismiss the claims against him for aiding and abetting securities fraud under section 206(1), 206(2), 206(4) and Rule 206(4)–(8) is denied.

## IV. SEC's Claim for Injunctive Relief

■ The SEC seeks to enjoin defendants from future violations of the acts, practices, transactions, and courses of business alleged in the Complaint. Section 20(b) of the '33 Act, 15 U.S.C. § 77t(b), section 21(d)(1) of the '34 Act, 15 U.S.C. § 78u(d)(1), and section 209(d) of the '40 Act, 15 U.S.C. § 80b–9(d), each give federal courts the power to enjoin "any person [who] is engaged, or is about to engage, in acts or practices" which constitute or will constitute a violation.

■ The Second Circuit has held that this language "requires a finding of 'likelihood' or 'propensity' to engage in future violations." *S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (citing *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 394 (2d Cir.1973)). However, "a trial judge is vested with considerable discretion in granting injunctive relief pursuant to th[ese] section[s, and t]here need be only a reasonable likelihood that the activity complained of will be repeated." *S.E.C. v. Materia*, 745 F.2d 197, 200 (2d Cir.1984); *see S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972) ("[F]raudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."); *see also S.E.C. v. Colonial Inv. Mgmt. LLC.*, 2008 WL 2191764 (S.D.N.Y. May 23, 2008) 160 F.Supp.2d 642, 655 (S.D.N.Y.2001), *aff'd*, 381 Fed.Appx. 27 (2d Cir.2010).

■ Among the other factors a court considers in determining whether there is a reasonable likelihood of future violations are: (1) the egregiousness of the past vio-lations; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant has accepted blame for his conduct; and (5) whether the nature of defendant's occupation makes it likely have he will have opportunities to commit future violations. *See S.E.C. v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998) (citation omitted). Moreover, "where . . . the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of litigation." *Gabelli*, 653 F.3d at 61.

The SEC has sufficiently pled a reasonable likelihood of recurrence. The Complaint alleges that Gould repeatedly and knowingly engaged in, and tried to conceal, conduct that violated the '33, '34, and '40 Acts. (Compl. ¶¶ 60–76.) Accordingly, Gould's motion to dismiss the claim for injunctive relief is denied.

## V. Paragraph 78 of the Complaint

Gould also seeks to strike paragraph 78 of the Complaint as irrelevant and prejudicial. The incident may, on the other hand, show consciousness of guilt. This fact-intensive issue can be resolved in a motion in *limine*. The request to strike paragraph 78 is denied without prejudice.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Complaint (Docket # 72) is DENIED.

SO ORDERED.